Hardin, P. J.
Upon this appeal, made upon a cause presenting all the evidence given, and from which the referee has made findings of fact and conclusions of law based thereon, it is the duty of this court to exercise “its unquestioned power of reviewing the evidence with a view of ascertaining whether the findings of fact accord with the weight of evidence ” Finch v. Parker, 49 N. Y., 8, Grover, J.; Smith v Ætna Life Ins. Co., 49 id., 211, Peckham, J.; Parsons v Brown, 5 Hun, 112; Roe v. Roe, 14 id., 612
At the time the adjustment was made in February, 1880, the plaintiff was in possession of the store containing the jewelry which remained, that had been covered by the chattel mortgage, and also of the property that had been purchased from time to time to supply and keep up the stock. There remained outstanding upon it the chattel mortgage referred to in the findings of fact, which was long past due and was held by the defendant.
The parties had several conversations to the tenor and effect that a settlement ought to take place between them, and thereafter they had an interview in which many of the incidents of the transactions that had taken place between them, intermediate the second day of August, 1875, and February, 1880, and some papers and accounts and statements were used between them, although it was alleged that some of the papers and entries had been destroyed by fire, and that the parties were not in the full possession of the details from which to make a consecutive and careful statement on both sides of the transactions that had taken place.
It is manifest from the testimony that the parties had a long discussion, ending in a disturbed and angry state of feeling in respect to the settlement. In the course of ‘that interview the defendant maintained that he had a claim of four or five hundred dollars against the plaintiff, and the plaintiff quite strongly insisted that there was nothing due, or, if anything, not as much as claimed by the defendant. Before they had finally separated, the defendant offered to take the sum of $300 in liquidation of all matters between them.
It appears that the plaintiff was a business man, not destitute of shrewdness and craft. He had been equal to pro *610 curing a somewhat unusual state of affairs, as he had been sufficiently sharp in coercing a settlement with his creditors, to warrant his being considered a person of ordinary intelligence and understanding, with a will of his own sufficient to enable him to secure such advantages as properly belonged to him.
Though he was told by the defendant that, unless a settlement was had, the goods would be sold upon a chattel mortgage, it is difficult to suppose that the plaintiff did not understand and comprehend that he had the right to tender to the defendant the amount that was due to the defendant, and that in default of an acceptance thereof by the defendant, that he had the right to redeem the property by an appropriate action. Of course, to determine what was the actual state of accounts or indebtedness between the parties, might require a somewhat protracted investigation, either voluntary or through the medium of the court.
The plaintiff was aware that there was an unadjusted claim on the part of the defendant for his services in the premises. Indeed, the referee finds that it was “understood between the parties that the defendant was to have reasonable pay for his assistance, and the services performed by him.” According to the plaintiff’s own testimony he, at the time of the controversy, understood quite well his rights in the premises, for, in connection with his testimony as to the threats made by the defendant, he says, viz.: “ He (defendant) said he was going to close me out; he would show me what he could do; he would have the thing shut up in less than twenty-four hours; I told him he would have to show I owed him something before he could do it; he said he could and would do it, and I told him to go ahead, he would have a good time of it; he got up and went out, and that is about all there was of it; I said I did not think he would close me without he could show that I owed him something; don’t know whether I understood that or not; that was what I said; we next met up in the office, and Wilcox paid him $300; I think it was at the time of this quarrel that defendant claimed I owed him $500 or $600, and I think we looked over a part of page 133 then, and must have looked over it once or twice before.”
It appears that after that interview the plaintiff applied to Wilcox to advance the money, and Wilcox, as a witness, testifies, viz.: “A short time prior to the execution of the bill of sale plaintiff came to me for a loan of money; we had several talks; the first time he wanted something over $300; said he wanted to pay Mr. Burrows. It is my impression that Burrows claimed between $400 and $500; we made no bargain at first talk; I don’t think I told him at the first talk what amount I would let him have; he called *611 again and said he and Burrows had settled on an amount of $300; I think plaintiff told me so, and I think they both told me so; that was shortly before bül of sale * * * I was in More’s office when the bill of sale was drawn.”
The defendant, in his testimony, states that he presented a bill to the plaintiff, and the plaintiff said “he was poor and didn’t feel able to pay it, and wanted to know what was the least I would take and square off all our deal and go out at that time; I am quite positive I showed him bill and figures now shown me, claiming $577.26. This was at the time we looked over page 133. After this looking over I saw plaintiff again, and he asked me if I had made up my mind what I would take; don’t think I told him at that time; I think I asked him a question at the time I claimed the $577.26; he said he was considerably indebted to me, but not as much as that; after looking over the plaintiff asked me if I would take $300 if he would find a man to help him and settle up; he said he knew a man he could get $300 of and buy out my interest then, whatever it was, and if he could, would take it, if I would take $300; my impression is I told him I would let him know very soon; I saw him again on the afternoon of the same day, or the next morning; he said William R. Wilcox would let him have $300, and, as near as I remember now, I then told him I would take $300, and settle all up and pass receipts; I think he got Wilcox, and the writings were drawn up in More’s office the same day, that is, the bill of sale to Wilcox.”
It appears the- parties then repaired to the office of Mr. More, an attorney, and executed a paper in the following language: “For and in consideration of the sum of $300, duly paid by William R. Wilcox, of Deposit, N. Y., we Almon T. Burrows and Abram L. Scudder, hereby sell, assign, transfer and set over to said William R. Wilcox the following property now in the store occupied by said Scudder in Deposit aforesaid, to wit.: One regulator clock, one stove, all the show-cases now in said store, and all the jewelry, gold and silverware now on the shelves and in the show-cases in said store, and all our and each of our right, title and interest in and to said goods and property, to have and to hold the same for his own use and benefit.
In witness whereof we have hereunto set our hands and seals this 18th day of February, 1880.
A. L. SCUDDER,
A. T. BURROWS.
The defendant testifies in addition, viz.: “Wilcox paid or satisfied me for the $300; this action was commenced .March3, 1881; from the time bill of sale was made until *612 this action was commenced no complaint was made to me by plaintiff in regard to this account; my services in the matter were worth $300.”
The witness More, who drew the bill of sale, among other ■ things, testified, viz.: “Plaintiff said to me that he had paid, or was going to pay, defendant $300; that it was more than he owed him, but he was going to pay him and get rid of him; I heard him further say in substance that he might better make some sacrifice and get rid of defendant than to continue any longer with him.”
In his re-examination the witness said, viz.: “I cannot tell whether plaintiff said he did not owe defendant anything, or that he didn’t owe him so much; plaintiff said he thought it was better to pay him $300 to get rid of him; he thought it was better, as he 'was situated to settle up with Burrows and get rid of him.”
From the testimony of the witness Wager, it appears that in the winter of 1880 the plaintiff told the witness he had got possession of the goods or interest defendant had in the goods in the store, and plaintiff informed the witness that “Mr. Wilcox had bought out defendant, and he had bought Wilcox out. He told me how much he had paid defendant through Wilcox.”
It seems that Scudder, the plaintiff, was examined in supplementary proceedings on the, 30th of January, 1877, in the suit of- one Jacobs, in which he testified, among other things, viz.: “Burrows owns all the goods I now have in my store, excepting some I took to sell on commission. The goods in my store were sold to Burrows some two years ago. The most of the goods now in my store were bought by Burrows himself. Burrows bought plated goods, clocks and jewelry now in the store of the dealers in his own name. There was a written assignment to Burrows, which he holds, of the notes and accounts. A. T. Burrows took possession of the goods in the store under a mortgage, dated August 2, 1875. Burrows did not remove the goods from the store, but appointed me an agent for him to sell the goods. -There was a written agreement to that effect. I have since the assignment ordered goods in my own name and sent the money to pay for them, sometimes with money arising from the sale of goods, and sometimes with money furnished by Burrows. I don’t know how the account now stands between me and Burrows, but know that the balance is a good deal; have not looked over in six or eight months, but know it is against me. The consideration for the mortgage was in notes that he held against me, some fourteen or fifteen hundred dollars. The notes were all given before; the mortgage, and the mortgage was given to secure the notes. *613 These notes were for money that Burrows lent me. I might have given the notes sometime after I borrowed the money, and think the notes were all given before the mortgage. My books only show what money I have paid Burrows since the assignment. Burrows let me have this money from time to time some six months prior to my giving him the mortgage. Have not _ had _ any settlement with Burrows. The goods specified in schedule to the mortgage are not yet all sold. Burrows let me have money out of his pocket for this indebtedness in small sums at different times. There are no goods in store besides what Burrows owns.”
In the fifth finding of fact, the referee says that the notes given simultaneously with the mortgage to defendant by the plaintiff “were made, executed and delivered on the second day of August, 1875, to the defendant by plaintiff without any consideration, and were without value in the hands of the defendant.”
9 In considering the credibility of the plaintiff as a witness, attention must be given to the evidence we have just quotedt given by him in the supplementary examination.
In considering the credibility of the defendant as a witness, it must be borne in mind that he was called as a witness by the plaintiff, and that a party calling a witness certifies to his credibility.
We are not satisfied to approve of the findings of fact made by the referee from the evidence before him. The plaintiff “ was not under arrest or restrained of his liberty in any way.
“He appears to have been a business man in full possession of his faculties.” * * *■
A mere threat to sue is not sufficient under such circumstances to make out duress.
“Where there is no arrest, no imprisonment, no actual force, and it is claimed that a promise was obtained by duress per minas, then, whether or not the promise was obtained by duress, must usually be a question of fact, and the question cannot be determined as one of law. It is not sufficient in such a case to satisfy the trial court that the threats were uttered; but it must also be shown that they constrained the will of the promissor and induced the promise.” Dunham v. Griswold, 100 N. Y., 226.
In McPherson v. Cox (86 N. Y., 473), it was said: “That it is not duress for a person to insist upon his legal rights.”
Eadie v. Slimmon (26 N. Y., 8), is not applicable to the case before us. That was a case where a married woman was terrified nearly to hysterics by threats of prosecution of her husband for alleged embezzlement, and the court held that *614 there was such coercion as to avoid a transfer of her separate property thus obtained.
Nor do the facts in this case bring it within Haynes v. Rudd (30 Hun, 239), or Bishop v. Fisher (36 Hun, 112). In each of those cases reference was made to threats ‘' for the purpose of overcoming the will of the party threatened by intimidating or terrifying him, ” and they were based upon the assumption that the threats had “constrained the will of the promissor and induced the promise, ” in accordance with the rule as stated by Earl, J., in Dunham v. Griswold (supra).
In one aspect of the evidence the $300 was paid to the defendant to induce him to sell his interest in the goods to Wilcox, and it was a satisfaction of all his claims against the plaintiff. Such seems to be the tenor of the bill of sale executed by the parties. Evidently the plaintiff at the time of the execution of the bill of sale, deemed it advisable to compromise and settle a disputed claim. They compromised, and the settlement should remain final between the parties if the case properly warrants the application of the language of Bockes, J., in Farmer's Bank of Amsterdam v. Blair (44 Barb., 642), where he says, viz.: “The controversy was a substantial one, and the compromise was, therefore, binding on the parties according to its terms. In such cases it is not admissible to go behind the settlement with a view to determine which of the parties was right. Compromises áre to be encouraged because they promote peace, and where there is no fraud, and the parties meet on equal terms and adjust their differences, the court will not overlook the compromise, but will hold the parties concluded by the settlement. 2 Duer., 302; 2 Sandf., 542; 4 Denio., 166; 4 Seld., 402; 35 Barb., 157. The compromise in this case was, therefore, binding on the parties.” Dolcher v. Fry, 37 Barb., 155.
Assuming that the defendant held the relation of trustee towards the plaintiff, it was still competent for them to make an adjustment of their affairs. Apparently each had an equal knowledge" of their affairs, and each had an opportunity to protect himself. Fisher v. Bishop, 36 Hun, 114, and cases there cited.
Under all the circumstances appearing in the evidence, we are of the opinion that the parties made a valid adjustment of their differences, and evidenced the adjustment by the bill of sale signed by them, to which reference has been had.
- The transactions in which the parties had been engaged do not commend themselves to this court, and it leaves the parties as they are by their voluntary adjustment, and to do so does not offend its sense of justice. See Nellis v. Clark (20 Wend., 26).
*615 Judgment reversed and new trial granted before another referee, with costs to abide the event.
Boardman and Follett, JJ., concur.